IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| JEFFREY M. OBERG, Ed.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 3:20-cv-0106 |
| | ) |
| KING & QUEEN COUNTY SCHOOL BOARD | ) |
| d/b/a King & Queen County Public Schools | ) |
| Serve: Celestine Gaines, Chair | ) |
|     992 Eastern View Road | ) |
|     St. Stephens Church, VA 23148 | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Jeffrey M. Oberg, Ed.D. ("Dr. Oberg"), by counsel, states as follows for his Complaint against defendant King & Queen County School Board d/b/a King & Queen County Public Schools ("K&Q," the "School Board," or the "School System").

### NATURE OF ACTION

1. This is an action for wrongful termination under Title VII[1] based on reverse discrimination. In 2016, Dr. Oberg, who is white, replaced a well-liked African-American, as the principal of the School System's high school, a school rich with African-American history. At that time, Carol Carter, Ph.D. ("Dr. Carter"), the Superintendent of the School System, was unsure if Dr. Oberg was the right fit for the position because he was white. She stayed out of the direct hiring process and instead used a hiring committee to select Dr. Oberg over an African-American candidate. Two years later, however, Dr. Carter stepped in and _reversed_ this hiring selection: forcing Dr. Oberg out and replacing him

---

[1] Title VII" refers to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

1

with the very same African-American candidate he had beaten out two years earlier. As explained herein, this action violates federal law, and Dr. Oberg now files this lawsuit to hold the School System liable for its unlawful actions.

## PARTIES

2. Jeffrey Oberg is an individual resident of Mechanicsville, Virginia. He is a white Caucasian male.

3. Defendant School Board is a corporate entity with authority to sue and be sued under Virginia law, *see* Va. Code § 22.1-71, and is an employer under Title VII.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

5. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

6. Dr. Oberg was employed at the School System for two years -- from 2016 to 2018. Prior to that time, he had been the high school assistant principal in King William County for six years (from 2010 to 2016). Then, in 2016, he became the principal of Central High School ("CHS" or "Central High") at K&Q, a position he held until he was unlawfully forced to resign by Dr. Carter.

7. At CHS, Dr. Oberg replaced a well-liked African American as the principal. This is significant. CHS has a rich African-American history. It was the all-black school in King & Queen County before desegregation, and pictures of all-black graduating classes line one of the school's hallways. The African-American community of King & Queen County

takes pride in CHS and has generally made it known that it prefers a person of color as the principal of Central High.

8. The racial history of CHS, in turn, also has translated, rightly or wrongly, into a racially-focused mindset with respect to the composition of the school's leadership. Most notably, when Dr. Oberg's predecessor left CHS, many in the African-American community of King & Queen County expected the new principal to be black, not white.

9. Dr. Carter fully understood this expectation. In a one-on-one conversion with Dr. Oberg after he had been hired, Dr. Carter told him she knew that the local African-American community wanted an African American to replace the former principal and oddly lamented to him that "sometimes I wish I were black."

10. Dr. Carter also told others about the racial preference for the principal of CHS. In a conversation with a fellow School System employee after Dr. Oberg had been hired, Dr. Carter confessed that she didn't think Dr. Oberg was the right fit.  To the contrary, she said she thought "someone black would be a better fit" and then referred back to the initial hiring process. In referring back to that process, Dr. Carter explained to the employee that: "we did have someone black apply" for Dr. Oberg's position and that "I think we should have hired him."

11. In the meantime, Dr. Oberg performed his job as CHS principal satisfactorily and regularly received praise for his performance.

12. Dr. Carter, for example, gave Dr. Oberg an "Exemplary" rating on his end of the year, 2016-2017, evaluation.  Indeed, in a specific comment on page 2 of the evaluation, Dr. Carter wrote: "Dr. Oberg was very cognizant of the climate and the need for the staff to heal from the previous administration.  He went out of his way to be aware of the needs of the staff.  He worked with the Leadership Team to develop and create a positive and safe

environment at Central High School."

13. Dr. Carter's "Exemplary" evaluation also included other positive comments, such as (i) "…he was prompt and detailed with all of his handling of discipline matters"; (ii) "Dr. Oberg works to create a culture of respect on a daily basis"; (iii) "He worked within the county policies and procedures to maintain a positive and collaborative atmosphere"; (iv) "There were multiple discipline and culture changes made within the building the first semester and he stood firm and these actions really paid off in the second semester.  Thank you for your instructional and professional leadership!!"; and (v) "Dr. Oberg worked to build relationship with parents and members of various organizations."

14. Even more, during his second year as principal of CHS, Dr. Oberg received professional development from the School University Research Network (SURN) out of the College of William and Mary.  He used this experience to work with all stakeholders with the hope of improving every aspect of CHS.  And, indeed, Dr. Oberg did such a good job helping, supporting, and improving the school that staff gave him rave reviews in a survey.  This was so impressive to the William and Mary SURN staff, that Dr. Patricia Shaffer of the Shaffer Evaluation Group conducted a phone interview with Dr. Oberg for him to explain what he was doing so well at his school.

15. This positive influence also was evident in the students' Standards of Learning ("SOL") results for the 2018 school year. Central High's SOL scores improved in twenty-eight (28) of thirty-eight (38) possible reporting categories. The English Reading and Writing Scores improved by twenty-one (21) percentage points.

16. Despite these and other similar accolades and markers of high performance, on April 9, 2018, Dr. Carter called Dr. Oberg into her office and told him that she was going to recommend that the School Board fire him.  She said she had spoken with members of

4

the School Board and she had the backing of at least three members. In her words, "I already have Board approval." Her only explanation for her proposed recommendation was that Dr Oberg was allegedly "not a good fit."

17. Dr. Oberg was shocked, but he asked if Dr. Carter would let him resign in lieu of termination. She said she would, which Dr. Oberg felt was the only option available to him given Dr. Carter's comments to him that she already had the votes to fire him. It was clear to him that if he had not resigned, Dr. Carter would have moved forward and had him fired by the School Board.

18. Almost immediately after the Board accepted Dr. Oberg's forced resignation, the position of CHS principal was posted on the School System's website. The posting stayed on the School Division's website for exactly one week -- from Friday, April 13, 2018 to Friday, April 20, 2018. During this week, only two candidates were interviewed by a committee and these candidates also interviewed with Dr. Carter on the same day. The two candidates were a white female and a black male. The black male, who was the same person who Dr. Oberg had beaten out two years earlier, was selected and approved by the School Board in less than one week. In short, the process was intentionally short-circuited in order to obtain precisely what Dr. Carter had expressly intended from the beginning: an African-American principal for CHS.

19. Since his unlawful termination, Dr. Oberg has been unable to find suitable full-time replacement employment

20. Dr. Oberg has exhausted his administrative remedies. His lawsuit also is timely filed within ninety (90) days his receipt of the EEOC's right-to-sue letter related to this matter.

## COUNT I:
### TITLE VII DISCRIMINATION CLAIM
### (RACE AND COLOR)

21. The allegations of paragraphs 1-20 are realleged as if fully set forth herein.

22. By virtue of his status as a white Caucasian, Dr. Oberg is entitled to Title VII's protection against discrimination based on his color and race.

23. Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to *discharge* any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" his color or race.

24. As is clear from the allegations stated herein, Dr. Oberg was discriminated against based on his color and race.

25. As a direct result of the School System's discrimination, Dr. Oberg has been caused to suffer the loss of potential occupational opportunities. Additionally, Dr. Oberg has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of the School System's actions.

WHEREFORE, Dr. Oberg respectfully and specifically requests the following relief against the School System:

    a. Accept jurisdiction of this case.

    b. Declare that he has suffered acts of discrimination under Title VII at the hands of the School System.

    c. Award him compensation for loss of salary and other benefits, including all fringe benefits, to which he would have been entitled had he not been discriminated against as to his employment. Such damages shall be in an amount in excess of five hundred thousand dollars ($500,000), the exact amount to be determined at trial.

      d.      Award him compensatory damages for the humiliation, damage to his reputation, mental and emotional distress, occupational losses, and pain and suffering that he has experienced and endured as a result of the unlawful actions of the School System. Such damages shall be in an amount in excess of one hundred fifty thousand dollars ($150,000), the exact amount to be determined at trial.

      e.      Award him front pay and back pay in an amount in excess of five hundred thousand dollars ($500,000), the exact amount to be determined at trial.

      f.      Award him pre-judgment interest;

      g.      Award him post-judgment interest;

      h.      Award him his costs and reasonable attorney's fees; and

      i.      Award him all such other further and appropriate equitable relief.

**A TRIAL BY JURY IS DEMANDED**.

                                    JEFFREY M. OBERG, Ed.D.

                      By:    s/ Richard F. Hawkins, III
                             Virginia Bar Number: 40666
                             THE HAWKINS LAW FIRM, PC
                             2222 Monument Avenue
                             Richmond, Virginia 23220
                             (804) 308-3040 (telephone)
                             (804) 308-3132 (facsimile)
                             Email: rhawkins@thehawkinslawfirm.net

                             Counsel for Plaintiff